UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 20-CR-10319 (MRG) |
| | ) | |
| | ) | |
| WILLIAM W. ROBERTSON | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

As the sergeant, Executive Officer, and second-in-command of MSP's Traffic Programs Section, William Robertson – for years – played a leading role in managing and supervising a conspiracy to commit overtime fraud by falsifying timesheets and collecting hundreds of hours of overtime pay that he and other troopers did not earn.  From at least as early as 2015 and continuing through early 2018, Robertson, along with his literal partner in crime, MSP Lieutenant Daniel Griffin, and their subordinate troopers in the Traffic Programs Section fraudulently collected at least tens of thousands of dollars in overtime pay by submitting false timesheets for hours that they did not actually work.[1]

For the reasons outlined below and to be articulated at the sentencing hearing scheduled for April 30, 2024, the government respectfully submits that a sentence of 42 months of incarceration, restitution in the amount of $142,774.77, forfeiture in the amount set forth in the government's motion for order of forfeiture, and the mandatory special assessment of $100 per

---

[1] Given the conservative methodology used for loss calculation, combined with years of missing MSP records, the actual total loss amount attributable to the conspiracy is likely significantly higher.  *See* PSR ¶¶ 12-13.

count is appropriate in this case and for this defendant.  Such a sentence would be sufficient, but not greater than necessary, to satisfy the sentencing objectives enumerated in 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND

After an eleven-day jury trial, Sergeant William Robertson and his co-defendant, Lieutenant Daniel Griffin, were convicted of theft concerning programs receiving federal funds, conspiracy to commit federal programs fraud, and wire fraud, all in connection with their years-long scheme to collect tens of thousands of dollars in overtime pay to which they were not entitled.  PSR ¶ 2.

The evidence at trial demonstrated that Sergeant Robertson, who served as second-in-command of the Traffic Programs Section ("TPS") at the Massachusetts State Police ("MSP"), conspired with Griffin and other members of TPS to commit overtime fraud by falsifying timesheets and collecting hundreds of hours of overtime pay for hours that they did not work. TPS was responsible for applying for and allocating hundreds of thousands of dollars annually in federal and state highway safety grants to pay for increased MSP traffic enforcement.  PSR ¶ 8. This increased traffic enforcement consisted of extra overtime shifts in the form of breath alcohol testing (BAT) sobriety checkpoints, distracted driving, click-it-or-ticket, and sustained traffic enforcement (STEP) shifts.  MSP overtime shifts were lucrative, paying troopers a rate that was one and a half times their regular hourly pay rate.  *See* Tr. Exhs. 11-16.  At its height, Sergeant Robertson was making almost $100 per hour in overtime pay.  Tr. Exh. 226.  And Griffin and Robertson, as the leaders of TPS, played a role in deciding what troopers could join the unit and which troopers were assigned to work these coveted overtime shifts.

From at least as early as 2015 and continuing through early 2018, Sergeant Robertson and his co-conspirators arrived to eight-hour BAT sobriety checkpoints late and left both four- and eight-hour overtime shifts hours early on a systematic and regular basis.  During the four-hour overtime shifts, Griffin, Robertson, and other members of TPS utilized code words over the radio, which everyone understood to mean that it was time to leave early, go home, and put in for the full shift in MSP's PayStation system.  *See, e.g.*, Tr. 2-131:12-19.  Thereafter, Robertson and his co-conspirators submitted false timesheets and other false paperwork in order to collect thousands of dollars in overtime pay to which they were not entitled.  *See, e.g.*, Tr. 2-159:8-16.

As reports of an overtime scandal and criminal investigation relating to overtime fraud in another MSP unit surfaced in 2017, Sergeant Robertson grew concerned that TPS could also face criminal exposure.  *See* PSR ¶ 16.  In an effort to conceal evidence of his own fraud at TPS, in late 2017, Sergeant Robertson directed a subordinate trooper to destroy evidence by shredding false overtime paperwork (Form SP-637s or "637s") that incriminated Robertson and the other members of TPS.  PSR ¶ 16.  As the subordinate trooper testified at trial, Sergeant Robertson hit him in the chest with a folder containing the 637s and yelled, "Get rid of these."  Tr. 5-120:11-16.  Through tears, the trooper testified that he stepped back, but Robertson continued, telling him, "Shred these fucking things.  Go shred them."  *See* PSR ¶ 16; Tr. 5-120:17-18.  The subordinate followed Robertson's orders and shredded the hard-copy 637s.  Tr. 5-120:19-20.  Having been given the explicit directive that incriminating records were to be shred, the subordinate trooper continued with that directive knowing that his immediate supervisor – Robertson – would approve.  Indeed, in 2018, when the same trooper informed Sergeant Robertson that he had taken additional Form 637s to his home and burned them in his fireplace, Robertson replied, "Good."  PSR ¶ 16; Tr. 5-122:20-25.

3

In total, Sergeant Robertson knowingly input false entries into PayStation for no fewer than 61 different federally-funded overtime shifts in 2015, 73 federally-funded overtime shifts in 2016, and 66 federally-funded overtime shifts in 2017.  In other words, Sergeant Robertson cheated on ***no fewer than 200*** federally-funded overtime shifts in just that three-year period.

## DISCUSSION

### I.      Sentencing Guidelines Calculation

As a preliminary matter, the government concurs with the defendant's offense level, criminal history, and Guidelines Sentencing Range ("GSR") as calculated by the U.S. Probation Office ("Probation") and detailed in the Presentence Investigation Report ("PSR") in this case. Specifically, the government agrees with Probation's application of the following enhancements:

- USSG § 2B1.1(b)(1)(E) (loss amount between $95,000 and $150,000),

- USSG § 3B1.3 (abuse of a position of trust),

- USSG § 3B1.1(c) (aggravating role as organizer, leader, manager, or supervisor), and

- USSG § 3C1.1 (obstruction of justice).

PSR ¶¶ 23-27.  As calculated by Probation, the defendant's Total Offense Level is 21 and his Criminal History Category ("CHC") is I, resulting in a GSR of 37 to 46 months.  PSR ¶¶ 22-31, 35-36, 69.  In addition, Probation has computed the Guidelines range for supervised release to be one to three years and the range for a fine to be from $15,000 to $150,000, as well as a mandatory special assessment of $100 per count.  PSR ¶¶ 73, 78-79.

The defendant has registered four objections to the USSG calculations, each of which lacks merit and has been rejected by Probation.  PSR at 24-26.  For the following reasons, as well as those outlined by Probation in the PSR, each Objection should be overruled.

First, in Objections #2 and #3, the defendant suggests that the total loss amount should not include overtime fraud committed by MSP Lieutenant Lawrence Kiely (Objection #2) or anyone else in TPS (Objection #3).  PSR at 24-25.  With respect to Kiely, Robertson objects based on the timing of Kiely's departure from the Traffic Programs Section and the notion that he "outranked" Sergeant Robertson.  PSR at 24.   With respect to overtime fraud committed by other members of TPS (that is, Robertson's co-conspirators), Robertson alleges that he "did not direct other troopers to submit false timesheets."  PSR at 25.

As the Court is well aware, Lieutenant Kiely and members of TPS, including John Jakobowski, Dennis Kelley, and Timothy Weldon, worked dozens of four- and eight-hour federally funded overtime shifts **with Sergeant Robertson** where both they and Robertson (1) left the shifts well in advance of the end time, and (2) knowingly input false entries into PayStation for those shifts.[2]  At trial, when asked to identify his supervisors from 2015 to 2017 when he worked TPS overtime shifts, Kiely explained, "Lieutenant Dan Griffin was the OIC at the time, and Sergeant William Robertson was the sergeant."  Tr. 6-36:8-12.  As Probation indicated in its response to Robertson's objection, "TPS fraudulent overtime losses are reasonably foreseeable to Robertson given his role in the criminal activity."  PSR at 24.  And, pursuant to Application Note 3 to USSG § 1B1.3, "[i]n the case of jointly undertaken criminal activity, [the Guidelines provide] that a defendant is accountable for the conduct (acts and omissions) of others that was:

---

[2] The government submits that the Court has on the record more than sufficient evidence that the total loss amount attributable to the TSP overtime fraud is (at an absolute minimum) $142,774.77.  *See* PSR ¶¶ 12-13.  With respect to Kiely specifically, summary charts at trial showed multiple examples of Kiely's participation in the fraud (*see, e.g.*, Tr. Exhs. 210-218) and were uncontested.  Kiely himself confirmed and corroborated these exhibits when he testified that he overlapped overtime shifts with his regular tour, left shifts early, and submitted bogus citations.  Nevertheless, as further support for Kiely's contribution to the total loss amount, the government submits Exhibit A, annexed hereto, which lays out Kiely's loss calculation using the same data and methodology as for other TPS members.

(i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity."  The fraudulent conduct of Kiely and other members of TPS could not fit more squarely into this Guideline.   Put simply, the TPS overtime hours that troopers lied about from 2015 to 2017 – that is, on Sergeant Robertson's watch – are rightfully included in the government's loss calculation.

Second, in Objection #5, Robertson argues that the "abuse of trust" enhancement should not apply, somehow asserting that "there is no evidence that this position of trust 'significantly facilitated the commission or concealment of the offense.'"  PSR at 25-26.  Robertson's assertion belies both reality and the record in this case.  First, the case which Robertson cites in his objection, *United States v. Chandler*, is inapposite.  There, a police officer in Louisiana was engaged in conduct (child exploitation and distribution of child pornography) completely unrelated to, and separate from, his job in law enforcement.  732 F.3d 434 (5th Cir. 2013).  As a matter of fact, the Court in *Chandler* provided the precise basis for which Robertson qualifies for the abuse of trust enhancement, observing in that case the lack of evidence that the defendant "acted in his capacity as a police officer" or "exploited his position as a police officer" in committing the charged offenses.  *Id.* at 439.

Here, Sergeant Robertson's conduct was inextricably linked with, facilitated through, ***and the direct result of*** his position as a member of the Massachusetts State Police.  Sergeant Robertson committed all of the charged crimes while wearing his MSP-issued uniform, while driving his MSP-provided cruiser, and while utilizing and manipulating MSP's record-keeping and payroll systems.  The federal funds Sergeant Robertson effectively embezzled were only accessible to him because of his position.  Indeed, ***but for*** Robertson's MSP badge, he could

never have committed ***any*** of the charged crimes.  And as a sergeant, Robertson was able to direct and coordinate the criminal conduct of his subordinates – including when he instructed a TPS trooper to shred the remaining paper evidence of their crimes.  In committing the crimes of which he has been convicted, Robertson was exclusively "acting in his capacity as a police officer" and "exploiting his position as a police officer."  Thus, and as Probation explained in rejecting Robertson's objection, the enhancement for abuse of a position of trust should be applied.

Finally, in Objection #6, Robertson argues that he was not an "organizer, leader, manager, or supervisor in the criminal activity," purportedly because he "did not direct others to submit false overtime documentation and 'did not approve the PayStation' entries of other troopers."  PSR at 26.  This could not be further from the truth.

As an initial matter, MSP helpfully organizes its units and officers with titles and ranks that assist in identifying who falls where in the chain of command.  Subordinate officers, like John Jakobowski, Dennis Kelley, and Timothy Weldon, have the rank of "trooper," while managers and supervisors – by definition – have titles like "sergeant."  Even more helpfully, Sergeant Robertson also held the title of "Executive Officer" of TPS after Griffin became OIC, and it went undisputed at trial that Robertson served as second in command of the unit.  Indeed, if ever there was any doubt that Robertson served as a manager or supervisor in the criminal enterprise that was the Traffic Programs Section, a TPS document describing the roles and responsibilities of each member made things crystal-clear: the very first bullet under Executive Officer was "**management of Traffic Programs GHQ office and assigned personnel**."  Tr. Exh. 61.  Last, in the starkest possible example of Robertson exerting his supervisory authority in furtherance of criminal conduct, Sergeant Robertson explicitly directed a subordinate trooper in

TPS to destroy the paper evidence of their crimes.  PSR ¶ 16.  As such, Probation has correctly applied an aggravating role enhancement for Robertson's position as an organizer, leader, manager, or supervisor in the criminal activity, and Robertson's objection here, too, should be overruled.

**II.     Sentencing Recommendation**

The government's recommended sentence – including 42 months of incarceration – is the reasonable and just outcome in a case where an MSP sergeant supervised and participated in – on a weekly basis for years – a conspiracy and scheme designed to enrich himself and his co-conspirators with overtime pay for hours they never worked at the expense of public trust.  And not only did he do this, shift after shift, but when faced with the possible exposure of his wrongdoing, he doubled-down by ordering a subordinate to literally shred the hard-copy records of his crimes: "Shred these fucking things.  Go shred them."  In short, a significant sentence of incarceration – indeed, a sentence in the middle of the Guidelines – would accomplish the goals of Section 3553(a) and would be no longer than necessary to do so.

Pursuant to 18 U.S.C. § 3553(a), the Court is required to consider a series of factors when determining an appropriate sentence.  These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant"; the four legitimate purposes of sentencing; "the kinds of sentences available"; the Guidelines range itself; any relevant policy statements by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants"; and "the need to provide restitution to any victims."  18 U.S.C. § 3553(a).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  Section 3553(a) also mandates that the sentence reflect the seriousness of the offense to, among other

8

things, promote respect for the law, provide just punishment, adequately deter criminal conduct, and protect the public from further crimes of the defendant.  Taken together, the considerations enumerated in Section 3553(a) – in particular, the nature and seriousness of the offenses of conviction, the need to promote respect for the law and impose just punishment, and the importance of general deterrence – weight in favor of a sentence that includes a significant and meaningful period of incarceration.

### A.  The Nature and Circumstances of the Offense Warrant a Sentence of 42 Months

First, the Court must consider the nature, circumstances, and seriousness of the offense, combined with the need for a sentence to promote respect for the law and provide just punishment for the offense.  18 U.S.C. §§ 3553(a)(1) and 3553(a)(2)(A).  Here, the government submits that the nature, circumstances, and seriousness of the offenses warrant a sentence that includes a significant and meaningful period of incarceration – specifically, 42 months.

As a threshold matter, Sergeant Robertson held a position of indisputable public trust and was expected to hold himself to a standard of honesty and moral certitude as a member of, and supervisory officer in, the Massachusetts State Police.  Unlike managerial roles in the private sector, Sergeant Robertson held a position requiring a rightfully elevated level of integrity.  In engaging and playing a lead role in a years-long conspiracy to commit overtime fraud, Robertson utterly failed to uphold the values required for his position and violated the public's trust.  At bottom, the nature and circumstances of Robertson's conduct speaks for itself: he supervised and actively participated in a years-long scheme to collect tens of thousands of dollars in overtime pay for hundreds of hours neither he nor his co-conspirators ever worked.  The core dishonesty demonstrated by Sergeant Robertson, a sworn member of the Massachusetts State Police who

held himself out as an upstanding law enforcement officer, as he left shifts early and lied about his hours, time and again, is astounding and inexcusable.

Perhaps worse, Sergeant Robertson's criminal conduct also had an unmistakable and deleterious effect on the public safety initiatives at the center of the fraud. As the Court is aware, the federally-funded overtime shifts were designed to promote public safety by, among other things, curbing drunk driving, encouraging seatbelt use, and reducing speeding on the roads and highways of Massachusetts. Even just the presence of marked MSP cruisers and uniformed officers, the Court heard at trial, can have a positive effect on traffic safety. By working only an hour of a four-hour shift or three hours of an eight-hour shift, Sergeant Robertson and his fellow members of TPS were collecting overtime pay for hours they never worked, misrepresenting to MSP that they had actually been present for these public safety-enhancing shifts, and letting down the public. While MSP and the U.S. Department of Transportation may be the institutional victims of the TPS fraud, the citizens of the Commonwealth of Massachusetts are the real victims in this case, and William Robertson's conduct serves only to erode the public's faith in its institutions.

What is more, Sergeant Robertson compounded his misconduct by obstructing justice in a way that had a material impact on the ability to uncover his wrongdoing and prevented the full scope of the fraud and corruption from coming to light.[3] Probation correctly applied an obstruction of justice enhancement, which Robertson is not contesting, but a two-level enhancement hardly captures the import of his obstruction. Not only did Robertson prevent the

---

[3] As the Court is aware, only a limited number of SP-637s were recovered, largely because they were very occasionally attached to emails sent after shifts to Griffin or Robertson. The full extent of their overtime fraud could have been elucidated via the full universe of 637s, had Robertson not ordered the destruction of such evidence. *See* PSR ¶ 13.

full extent of the conspiracy from seeing the light of day, but it provided yet another example of a person in a position of power and trust engaging in criminal conduct that he thought he could get away with.

This is not a case where a defendant is appearing before this Court based on an aberrant lapse in judgment that tarnished an otherwise law-abiding career serving the public. Robertson is before this Court because he repeatedly showed a lack of judgment and lack of respect for the law, and he routinely engaged in conduct that he knew was wrong. Shift after shift, week after week, year after year – for 200 federally-funded overtime shifts between 2015 and 2017 – Robertson left early, logged false entries in PayStation, and collected time and a half for hundreds of hours he never worked. And the moment he felt like the fraud could be discovered, he topped it all off by ordering a subordinate trooper to destroy the remaining hard-copy evidence of his misdeeds. In the end, the nature and circumstances of Sergeant Robertson's conduct cry out for a significant and meaningful sentence of incarceration.

### B.  General Deterrence Mandates a Significant Sentence

Pursuant to 18 U.S.C. § 3553(a)(2)(B), the Court also must consider the need for the sentence to afford adequate specific and/or general deterrence to criminal conduct. Here, the government submits that the Court should be particularly concerned with general deterrence. As the defendants themselves suggested at trial, they are not the first members of the Massachusetts State Police to falsify their overtime records, and Sergeant Robertson ordered the destruction of evidence as a result of news of overtime fraud relating to another unit at MSP. While the conduct of other troopers does not in any way explain, excuse, or diminish the conduct of the defendants in this case, it does underscore the need for this Court to impose a sentence that takes

11

general deterrence into account and sends a message to other members of law enforcement that this type of criminal conduct will not be tolerated.

A sentence that includes a significant period of incarceration is necessary to deter others similarly situated to Sergeant Robertson – that is, members of MSP and other members of law enforcement – who might be tempted to engage in the same course of conduct.  A sentence without a significant period of incarceration would not accomplish this goal.  The government submits that a sentence of 42 months of imprisonment will adequately serve to generally deter others from contemplating or engaging in such crimes.

### C.  Robertson's History and Characteristics Weigh in Favor of a Significant Sentence

Sergeant Robertson's history and characteristics also weigh in favor of a longer incarcerative sentence.  *See* 18 U.S.C. § 3553(a)(1).  Robertson has had more advantages than most defendants who appear before this Court.  He was raised in a two-parent family alongside six siblings.  PSR ¶ 41.  He has a supportive family, including a devoted wife and three loving children.  PSR ¶ 51.  He attended college and embarked on a long and lucrative career at MSP. PSR ¶¶ 63, 66-67.

Unlike so many of the defendants who appear before this Court, Sergeant Robertson has not struggled with poverty, addiction, or a lack of opportunity.  To be clear, while these challenges do not excuse criminal behavior, they sometimes provide context for criminal conduct.  That is not the case here.  There are no mitigating factors in this case, and the defendant should be sentenced accordingly.

**CONCLUSION**

For all of the foregoing reasons, the government respectfully recommends that the Court impose a sentence of 42 months of imprisonment, restitution in the amount of $142,774.77, forfeiture in the amount set forth in the government's motion for order of forfeiture (Dkt. No. 220), and the mandatory special assessment of $100 per count.  Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offenses and the goals of sentencing.

Respectfully submitted,

WILLIAM F. ABELY
Attorney for the United States,
Acting Under Authority Conferred by
28 U.S.C. § 515

Date:  April 25, 2024          By:     /s/ Adam W. Deitch_____
                                       DUSTIN CHAO
                                       ADAM W. DEITCH
                                       Assistant U.S. Attorneys

## <u>CERTIFICATE OF SERVICE</u>

Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Adam W. Deitch*_____

Adam W. Deitch
Assistant United States Attorney

Dated:  April 25, 2024